# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **PLANNED PARENTHOOD SOUTHWEST OHIO REGION** | : | Case No. 1:14-cv-867 |
| C/O Gerhardstein & Branch, LPA | : | |
| 432 Walnut Street, Suite 400 | : | **Judge** |
| Cincinnati, Ohio 45202 | : | |
| | : | |
| **Plaintiff,** | : | |
| vs. | : | |
| | : | |
| **RICHARD HODGES** | : | **COMPLAINT FOR DECLARATORY** |
| 246 N. High Street | : | **AND INJUNCTIVE RELIEF** |
| Columbus, Oh 43215 | : | |
| In his official capacity as the Director of the | : | **TEMPORARY RESTRAINING** |
| Ohio Department of Health | : | **ORDER REQUESTED** |
| | : | |
| and | : | |
| | : | |
| **UNIVERSITY OF CINCINNATI MEDICAL CENTER, LLC** | : | |
| 3200 Burnet Avenue | : | |
| Cincinnati, OH 45229 | : | |
| | : | |
| and | : | |
| | : | |
| **UC HEALTH** | : | |
| **C/O AGENT:GH&R Business Services, Inc.** | : | |
| 511 Walnut Street 1900 5/3 Center | : | |
| Cincinnati, OH 45202 | : | |
| | : | |
| **Defendants.** | : | |

## I. PRELIMINARY STATEMENT

1. This civil rights case challenges Ohio's continuing assault on the right of women to exercise reproductive freedom and its efforts to prevent Plaintiff Planned Parenthood Southwest Ohio Region ("PPSWO"), which operates the last remaining ambulatory surgery

facility that performs abortions in the metropolitan Cincinnati area, from continuing to provide abortions.

2.	Despite the fact that surgical abortion is one of the safest medical procedures with an over 99% safety record, Ohio requires that such abortions be provided only in ambulatory surgical facilities ("ASFs") that maintain a written transfer agreement ("WTA") with a hospital. Accordingly, PPSWO has held an ASF license for its Elizabeth Campbell Medical Center ("PPSWO ASF") since May 2000. For many years, as required by Ohio Department of Health ("ODH") regulations for ASFs, PPSWO maintained a WTA with the University of Cincinnati Medical Center ("UCMC") or its predecessor, UC Medical College, that outlined the process for the transfer to UCMC of PPSWO's patients experiencing a rare complication requiring hospital-based treatment.

3.	In 2013, the Ohio Legislature enacted, and Governor Kasich signed, the budget measure HB 59, which banned abortion clinics – and only abortion clinics – from obtaining the necessary WTA from a "public hospital." Ohio Rev. Code Ann. § 3727.60 ("public hospital ban"). As a result, UCMC terminated its WTA with PPSWO on September 28, 2013, the day before the effective date of the ban. Unable to obtain a WTA with any other hospital in the area, on September 18, 2013, PPSWO submitted a request to ODH for a variance of the requirement, as permitted by statute. PPSWO's request for a variance satisfied each and every legally prescribed element and demonstrated that it had several physicians in good standing and with admitting privileges at a local hospital ready and willing to treat any PPSWO patients who may need hospital-based care. Though the variance request was submitted over 13 months ago, ODH has never acted on it.

4. Instead, ODH has recently notified PPSWO that it is out of compliance with the WTA requirement and has threatened to revoke PPSWO's ASF license. Under Ohio law, PPSWO's alleged non-compliance with the WTA requirement exposes PPSWO to civil penalties and revocation of its ASF license. If ODH revokes PPSWO's ASF license, the last provider of surgical abortion services in the Greater Cincinnati area will close, making abortions virtually unavailable in Cincinnati and violating the constitutional rights of and imposing irreparable harm upon PPSWO and its patients.

5. This Court must act to declare the public hospital ban unconstitutional on its face and as applied to PPSWO, enjoin its enforcement, reinstate PPSWO's agreement with UCMC, and enjoin Defendant Hodges from seeking to revoke PPSWO's ASF license.

## II. JURISDICTION AND VENUE

6. Jurisdiction over the federal claims is conferred on this Court by 28 U.S.C. § 1331 and §1343(a)(3) and (a)(4).

7. Venue is proper under 28 U.S.C. § 1391.

## III. PARTIES

8. Plaintiff PPSWO is a non-profit corporation organized under the laws of the State of Ohio, and operates seven health centers in and around Cincinnati, Ohio. PPSWO and its predecessor organizations have provided care in Ohio since 1929. PPSWO provides a broad range of medical services to women and men in Ohio, including: birth control, annual gynecological examinations, cervical pap smears, diagnosis and treatment of vaginal infections, testing and treatment for certain sexually transmitted diseases, HIV testing, pregnancy testing, and abortions. PPSWO operates an ambulatory surgical facility in the Elizabeth Campbell Medical Center, at 2314 Auburn Avenue, Cincinnati, Ohio, where surgical abortion services are provided through 17.6 weeks of pregnancy as dated from the first day of the woman's last

menstrual period ("LMP") and medication abortions are provided through 49 days LMP. PPSWO provides approximately 2,600 abortions a year. PPSWO sues on its own behalf, on behalf of its current and future medical staff, servants, officers, and agents, and on behalf of its patients.

9. Defendant Richard Hodges is the director of the Ohio Department of Health and is responsible for enforcing the ASF laws and rules, issuing ASF licenses, and granting variances of the ASF requirements. Defendant Hodges also has the authority to impose civil penalties and take actions to close an ambulatory surgery facility that is operating without a license. He is not a physician. Defendant Hodges is a "person" under 42 U.S.C. § 1983, and all of the actions alleged in this case have been taken under color of law. He is sued in his official capacity.

10. Defendant University of Cincinnati Medical Center, LLC and Defendant UC Health are Ohio businesses properly registered through the Ohio Secretary of State.

11. Defendant UCMC is a hospital that is part of UC Health.

12. UCMC has concluded that it is a "public hospital" as that term is defined under Ohio Rev. Code Ann. § 3727.60 (A)(4). UCMC and UC Health are necessary parties to this case, particularly to any injunction order that would be entered by this Court prohibiting enforcement of the public hospital ban.

13. Defendants UCMC and UC Health are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

IV. **FACTS**

A. **Abortion Practice and Safety**

14. Women seek abortions for a variety of physical health, mental health, familial, economic, and personal reasons. Approximately one in three women in this country will have an abortion by age 45.

15. Some women seeking abortions suffer from medical conditions including, but not limited to, diabetes, cancer, hypertension, cardiac disease, kidney disease, history of postpartum hemorrhaging, and sickle cell anemia. Other women seek abortions because of their age, because they are pregnant as a result of rape or incest, or because there are or may be anomalies in the fetus, some of which are fatal to the fetus. Due to these various factors, continuing a pregnancy can pose a risk to the lives and to the physical, mental, and emotional health of these women.

16. Most women having abortions (61%) already have at least one child, and 66% plan to have children when they are older, financially able to provide necessities for them, and/or in a supportive relationship with a partner so their children will have two parents.

17. Most abortions are performed during the first trimester of pregnancy, when the gestational age of the fetus is at or less than fourteen weeks LMP.

18. Because abortion is so safe, the vast majority of abortions can be and are safely provided in an outpatient setting. In 2013, 99.6% of Ohio abortions were performed in an outpatient center.

19. Even though abortion rarely results in complications, Plaintiff PPSWO provides high quality care in the rare event that it does. Most of the rare complications related to abortion are safely and appropriately handled in the clinic.

20. In the exceedingly rare case that a patient requires hospital-based care, PPSWO has contractual relationships with several back-up physicians who have admitting privileges at a local hospital, as well as an appropriate protocol for ensuring that the patient receives the necessary care.

21. WTAs do nothing to increase patient safety or health and are not medically necessary. And there is certainly no legitimate reason, even if a WTA is required, to exclude public hospitals from the list of eligible hospitals. To the contrary, if the purpose of a WTA is to improve patient safety, it is irrational to exclude the hospitals in a community, such as teaching hospitals, that might provide the highest level of patient care.

22. Regardless of whether an ASF has a WTA with a local hospital or an alternative arrangement that meets the alleged purpose of the WTA requirement, appropriate care is also ensured because hospitals in Ohio must comply with the Emergency Medical Treatment & Labor Act, which requires hospitals to treat and stabilize all emergency patients (unless transfer to another facility is otherwise indicated). 42 U.S.C. § 1395dd(b) (commonly referred to as EMTALA).

### B. ASF Licensing Framework and the Public Hospital Ban's Discriminatory Treatment of ASFs that Provide Abortions

23. In 1995, Ohio passed a law requiring ASFs to obtain a facility license from ODH. In 1999, ODH notified the abortion facilities in Ohio that they needed to apply for such a license.

24. By ODH regulation, all ASFs were required to have a WTA. Specifically, Ohio Admin. Code § 3701-83-19(E) stated: "The ASF shall have a written transfer agreement with a hospital for transfer of patients in the event of medical complications, emergency situations, and for other needs as they arise." An ASF could apply for a variance from the WTA requirement, as it could from any other ASF requirement, pursuant to Ohio Admin. Code § 3701-83-14, by demonstrating that "the requirement has been met in an alternative manner," *id.* at (C)(1), or that it would suffer "undue hardship" from the requirement and that granting the waiver would not "jeopardize the health and safety of any patient," *id.* at (C)(2).

25. In 2006, the Sixth Circuit upheld the WTA requirement as applied to the abortion provider Women's Med Center in Dayton, but did so because it recognized that ODH could grant a variance of the requirement if the clinic showed that it could adequately ensure that in the exceedingly rare case that a patient needed care at a local hospital, the patient would receive continuity of care. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006).

26. In 2013, as part of the omnibus budget bill ("HB 59" or "Act"), the legislature altered the ASF licensing scheme with respect to the WTA provisions.

27. Originally required only by regulation, a WTA requirement was incorporated into statute. Ohio Rev. Code Ann. § 3702.303(A) now provides:

> Except as provided in division (C) of this section, an ambulatory surgical facility shall have a written transfer agreement with a local hospital that specifies an effective procedure for the safe and immediate transfer of patients from the facility to the hospital when medical care beyond the care that can be provided at the ambulatory surgical facility is necessary, including when emergency situations occur or medical complications arise. A copy of the agreement shall be filed with the director of health.

28. HB 59 also amended the ASF licensing provisions to prohibit any "public hospital" from "enter[ing] into a written transfer agreement with an ambulatory surgical facility in which nontherapeutic abortions are performed or induced." Ohio Rev. Code Ann. § 3727.60(B)(1) ("public hospital ban"). The ban applies only to clinics that provide abortions and does not apply to any other ASF in the state.

29. HB 59 also provided a new variance process, which applies only to a variance of the WTA requirement. The contents of an application for a variance from the WTA requirement are now set out in Ohio Rev. Code Ann. § 3702.304, which provides:

> (A) The director of health may grant a variance from the written transfer agreement requirement of section 3702.303 of the Revised Code if the ambulatory surgical facility submits to the director a complete variance application, prescribed by the director, and the director determines after reviewing the

7

application that the facility is capable of achieving the purpose of a written transfer agreement in the absence of one. The director's determination is final.

(B) A variance application is complete for purposes of division (A) of this section if it contains or includes as attachments all of the following:

(1) A statement explaining why application of the requirement would cause the facility undue hardship and why the variance will not jeopardize the health and safety of any patient;

(2) A letter, contract, or memorandum of understanding signed by the facility and one or more consulting physicians who have admitting privileges at a minimum of one local hospital, memorializing the physician or physicians' agreement to provide back-up coverage when medical care beyond the level the facility can provide is necessary;

(3) For each consulting physician described in division (B)(2) of this section:

(a) A signed statement in which the physician attests that the physician is familiar with the facility and its operations, and agrees to provide notice to the facility of any changes in the physician's ability to provide back-up coverage;

(b) The estimated travel time from the physician's main residence or office to each local hospital where the physician has admitting privileges;

(c) Written verification that the facility has a record of the name, telephone numbers, and practice specialties of the physician;

(d) Written verification from the state medical board that the physician possesses a valid certificate to practice medicine and surgery or osteopathic medicine and surgery issued under Chapter 4731 of the Revised Code;

(e) Documented verification that each hospital at which the physician has admitting privileges has been informed in writing by the physician that the physician is a consulting physician for the ambulatory surgical facility and has agreed to provide back-up coverage for the facility when medical care beyond the care the facility can provide is necessary.

(4) A copy of the facility's operating procedures or protocols that, at a minimum, do all of the following:

(a) Address how back-up coverage by consulting physicians is to occur, including how back-up coverage is to occur when consulting physicians are temporarily unavailable;

(b) Specify that each consulting physician is required to notify the facility, without delay, when the physician is unable to expeditiously admit patients to a local hospital and provide for continuity of patient care;

(c) Specify that a patient's medical record maintained by the facility must be transferred contemporaneously with the patient when the patient is transferred from the facility to a hospital.

(5) Any other information the director considers necessary.

(C) The director's decision to grant, refuse, or rescind a variance is final.

(D) The director shall consider each application for a variance independently without regard to any decision the director may have made on a prior occasion to grant or deny a variance to that ambulatory surgical facility or any other facility.

30. The only ASFs to have sought waivers from ODH from the WTA requirement are ASFs that provide abortions.

31. If an ASF provides surgical services without complying with the WTA requirement or receiving a variance, ODH can (1) "revoke, suspend, or refuse to renew" the ASF's license; (2) issue an order prohibiting the ASF from performing certain services prior to or pending an administrative hearing; (3) impose a civil penalty between one thousand dollars and two hundred and fifty thousand dollars; and (4) impose additional civil penalties between five hundred dollars and ten thousand dollars for each day that the ASF fails to correct the violation. Ohio Admin. Code § 3701-83-05.1(C); Ohio Rev. Code Ann. § 3702.32(D). If ODH determines that an ASF is operating without a valid license, ODH can: (1) issue a written order that the ASF cease its operations; (2) issue a written order that prohibits the ASF from performing certain types of services; and/or (3) impose a civil penalty between one thousand and two hundred and fifty thousand dollars. Ohio Admin. Code § 3701-83-05.1(A); Ohio Rev. Code Ann. § 3702.32 (A). In addition, ODH can impose daily civil penalties between one thousand and ten thousand dollars for each day that the ASF operates without a license in violation of ODH's written order, and can seek an injunction in the court of common pleas to enjoin the facility from operating. Ohio Admin. Code § 3701-83-5.1(A)(5) & (B); Ohio Rev. Code Ann. § 3702.32 (A)(5) & (B).

32. There is no legitimate state purpose that supports the restrictions on abortion clinics, and abortion clinics alone, imposed by HB 59.

33. In fact, the purpose of the changes to the ASF requirements in HB 59 was to reduce access to abortion. For example, upon its introduction in committee, State Senator Joe Ueker, stated that, "Someone has to stand up for the rights of the unborn."[1] Similarly, when Governor Kasich refused to use his line-item veto, his spokesperson stated that "[t]he governor is pro-life and we believe these are reasonable policies to help protect human life."[2] Mike Gonidakis, a member of the Ohio medical board and president of Ohio Right to Life, stated regarding the section: "Ohio has a history of advancing common-sense pro-life initiatives. We are very conscious not to overreach. . . . We believe in the incremental approach: one step at a time, advancing legislation that will withstand court scrutiny."[3]

C. **Plaintiff's ASF Licensing History and Compliance with HB 59**

34. Since 2000, PPSWO operated with an ASF license, applying for and receiving annual license renewals. PPSWO applied for a renewal of its ASF license in May 2013 and again in May 2014, but ODH has never responded to those applications. By operation of Ohio administrative procedure law, once a facility is granted an ASF license, even if ODH ignores its annual renewal application, the ASF may continue to operate until ODH revokes the license.

---

[1] Ann Sanner, *Abortion-Related Issues Remain Part of Ohio Budget*, The Associated Press, June 6, 2013, *available at* http://www.crescent-news.com/editors%20pick/2013/06/06/abortion-related-issues-remain-part-of-budget.

[2] Juliet Eilperin, *Abortion Limits at State Level Return Issue to National Stage*, The Washington Post, July 5, 2013, *available at* http://www.washingtonpost.com/politics/abortion-limits-at-state-level-return-issue-to-the-national-stage/2013/07/05/f86dd76c-e3f1-11e2-aef3-339619eab080_story.html.

[3] Rachel Weiner, *What makes Ohio's New Abortion Law Unique*, The Washington Post, July 1, 2013, *available at* http://www.washingtonpost.com/blogs/the-fix/wp/2013/07/01/what-makes-ohios-new-abortion-law-unique/.

35. Initially PPSWO had a WTA with UC Medical College, which eventually became UCMC. The most recent UCMC WTA, dated May 29, 2013, was effective for one year, with an automatic one-year renewal period.

36. UCMC, the nation's first teaching hospital, is an internationally recognized hospital with state-of-the-art medical facilities. UCMC is the only hospital in the region that is designated as a Level 1 trauma center by the American College of Surgeons because of its highly specialized emergency medicine team and its ability to treat the most complex emergency situations.

37. After the Act was signed, UCMC determined that it was a "public hospital" within the meaning of the Act and provided notice to PPSWO that it would terminate the WTA with PPSWO as of September 28, 2013, the day before the effective date of the public hospital ban. Thus, the public hospital ban caused PPSWO to lose its WTA with UCMC.

38. UCMC is a non-profit institution that is privately operated. On information and belief, the definition of "public hospital" in the ban was drafted broadly in part with the intent to include UCMC so that the WTA between UCMC and PPSWO would be terminated.

39. Since receiving notice of the termination of its WTA with UCMC, PPSWO has approached all the local hospitals seeking a WTA, but those hospitals either rejected or ignored PPSWO's requests. Many of the local hospitals are Catholic institutions with a stated opposition to cooperating in the delivery of abortion services. Thus, PPSWO has been unable to secure a WTA with a non-"public" hospital because of the complete discretion exercised by those hospitals to refuse or ignore PPSWO's requests because of their religious, political, ideological or other preferences.

40. Prior to the expiration of the WTA with UCMC, on September 18, 2013, PPSWO applied for a variance from the WTA requirement. PPSWO's variance application complies in every respect with Ohio Rev. Code Ann. § 3702.304. The application included contracts with several back-up physicians with privileges at a local hospital who have agreed to provide care to PPSWO's patients, as well as a patient hospital transfer policy in order to assure ODH that PPSWO provides continuous care to any patient who requires transfer to a hospital.

41. PPSWO updated the variance application in May, July, and August 2014 to reflect changes in the physicians providing back-up coverage.

42. Although the variance request has now been pending for over 13 months, ODH has failed to act on it, or substantively respond to it in any way.

D. **Threatened Revocation of PPSWO's ASF License, and Impact on PPSWO and Its Patients.**

43. On October 14, 2014, ODH informed PPSWO that it did not comply with the ASF licensing requirements because it lacked a WTA. The letter required that a plan of correction be submitted to ODH and threatened to revoke PPSWO's license if the plan of correction is deemed unacceptable.

44. Given PPSWO's inability to secure a WTA from a non-"public" hospital and the termination of its WTA with UCMC pursuant to the public hospital ban, PPSWO is unable to satisfy the WTA requirement.

45. PPSWO provided a plan of correction to ODH on October 24, 2014, reminding ODH of its pending application for a variance from the WTA requirement.

46. Defendant Hodges has chosen to cite PPSWO for a deficiency and threaten license revocation without first ruling on PPSWO's application for a variance. ODH has used this tactic in the past with another abortion provider.

47. Because of PPSWO's alleged non-compliance with the WTA requirement, ODH could at any moment begin the process of revoking PPSWO's ASF license, issue an order prohibiting PPSWO from providing abortion services during the pendency of the proceedings, and/or impose substantial penalties on PPSWO.

48. Thus, the public hospital ban has caused irreparable injury to PPSWO as it eliminated the only WTA available to PPSWO. As a result, PPSWO has no WTA and no variance presently approved by the ODH, which, in the absence of an injunction, will lead to a revocation of the ASF license. Without an ASF license, PPSWO will be forced to cease providing surgical abortions, causing PPSWO, its staff, and its patients irreparable injury from exposure to penalties, denial of abortion services, closure of the ASF, loss of income, and inability to provide or receive comprehensive reproductive health care.

49. If the PPSWO ASF is closed, Cincinnati will be the largest metropolitan area in the United States without a surgical abortion provider. Given the significant restrictions on medication abortion approved by the legislature in 2004, and in effect since 2011, medication abortion is rarely provided in Ohio, leaving abortion virtually unavailable in Cincinnati if PPSWO were to close. As of the 2010 census, the Cincinnati metropolitan area had a population of over 2.1 million residents, making it the largest metropolitan area in all of Ohio.

50. At the time that the public hospital ban was enacted, there were only two ASFs that provided abortions in the Cincinnati area: PPSWO and Lebanon Road Surgery Center ("LRSC"). LRSC also could not obtain a WTA, but had operated under a variance from the requirement based on its protocols and its arrangements with several back-up doctors with admitting privileges at a local hospital. ODH initially granted LRSC a variance in October 2010. LRSC applied for a renewal of its variance in 2012. Without ruling on the variance application,

ODH began the process of revoking LRSC's ASF license. Although an administrative hearing was held regarding whether the ASF license should be revoked, the hearing officer refused to rule on whether LRSC's variance application should be granted. On January 17, 2014, the Director of Health denied the variance application. Twenty minutes later, the Director revoked LRSC's ASF license. Following an appeal in the Ohio state court system, LRSC was ordered to stop providing surgical abortions as of August 22, 2014, which it has done. Thus, PPSWO is the last remaining surgical abortion provider in the Cincinnati area.

51. If the PPSWO ASF license is revoked, any woman who would have sought a surgical abortion at PPSWO's ASF will have to travel to another city to obtain an abortion – and will likely need to make that trip twice because of a state law that requires two trips to the clinic (the first for counseling and an ultrasound and the second visit, at least 24 hours later, for the abortion). The closest clinic, Women's Med Center in Dayton, is already having difficulty meeting the increased demand for its services from the closure of LRSC and lacks the capacity to serve the additional patients presently served by PPSWO, thus forcing PPSWO patients to travel even farther to obtain an abortion. Clinics in Columbus, Ohio also lack capacity to serve the PPSWO ASF surgical patients.

52. The long-term ability of the Dayton clinic to continue to provide abortions also remains in doubt. The Dayton clinic has never been able to obtain a WTA from a hospital. It has been licensed pursuant to a variance first granted in March 2008. However, ODH has never responded to its annual ASF license renewal applications or renewed requests for a variance filed in August 2012, August 2013, and August 2014.

53. Due to significant delays in scheduling an abortion because of the reduced availability of abortion providers, women who are earlier in their pregnancies will face

significant and possibly dangerous delays. For other women, the additional travel required to obtain an abortion will increase the costs and delay the abortion. Although abortion is one of the safest surgical procedures, the risk of complications (as well as the cost of the procedure) increases as the pregnancy advances.

54. Given that the majority of PPSWO's patients are low-income, the increased costs, travel, and delays will make it impossible for a significant number of women to obtain an abortion.

55. Shutting down PPSWO's ASF will jeopardize women's health and deprive women of their constitutionally protected right to obtain a pre-viability abortion.

56. In recent years ODH has followed a deliberate strategy of reducing access to abortion services in Ohio by imposing and enforcing regulations that do not promote women's health or any other valid state interest and by delaying and denying variances from the WTA requirement to abortion providers. At the beginning of 2013 there were 14 abortion providers in Ohio. Today there are only eight abortion providers. Three of the eight remaining clinics are in jeopardy of closing. ODH is in litigation over the license revocation of the last abortion clinic in Toledo, is threatening PPSWO with license revocation proceedings of the last abortion clinic in Cincinnati, and is refusing to rule on the variance and license renewal of the last abortion clinic in Dayton. These actions have been taken to deny Ohio women abortion services, not to protect or promote their health.

## V. CLAIMS FOR RELIEF – 42 U.S.C. §1983

### COUNT I
#### (Substantive Due Process – PPSWO's Patients)

57. The allegations of paragraphs 1 through 56 are incorporated as though fully set forth herein.

58. Defendants have violated rights to liberty and privacy secured to PPSWO's patients by the due process clause of the Fourteenth Amendment to the United States Constitution. The public hospital ban and Defendant Hodges' actions with respect to PPSWO's license have the purpose and effect of imposing a substantial obstacle in the path of women seeking abortions without furthering a valid state interest.

## COUNT II
### (Equal Protection)

59. The allegations of paragraphs 1 through 58 are incorporated as though fully set forth herein.

60. The public hospital ban, Defendant Hodges' actions with respect to PPSWO's license, and Defendants' actions described above violate PPSWO's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution by treating PPSWO differently from other similarly situated parties without a sufficient state interest.

## COUNT III
### (Substantive Due Process – PPSWO)

61. The allegations of paragraphs 1 through 60 are incorporated as though fully set forth herein.

62. The public hospital ban, Defendant Hodges' actions with respect to PPSWO's license, and Defendants' actions described above violate PPSWO's due process rights under the Fourteenth Amendment to the United States Constitution as they lack any rational basis.

## COUNT IV
### (Due Process – Non-Delegation)

63. The allegations of paragraphs 1 through 62 are incorporated as though fully set forth herein.

64. The public hospital ban, Defendant Hodges' actions with respect to PPSWO's license, and Defendants' actions described above violate PPSWO's due process rights under the Fourteenth Amendment to the United States Constitution by delegating standardless and unreviewable authority to private parties and employing a constitutionally insufficient variance process.

VI. **PRAYER FOR RELIEF**

**WHEREFORE**, PPSWO requests that this Court:

A. Issue a declaratory judgment that Ohio Rev. Code Ann. § 3727.60 ("public hospital ban") is unconstitutional facially and as applied to PPSWO.

B. Issue a temporary restraining order and preliminary and permanent injunction against Defendant Hodges and all those acting in concert with him, from enforcing Ohio Rev. Code Ann. § 3727.60; and from revoking or not renewing Plaintiff PPSWO's ASF license;

C. Issue a temporary restraining order and preliminary and permanent injunction against Defendants UCMC and UC Health, ordering UCMC to reinstate the WTA dated May 29, 2013;

D. Award to Plaintiff PPSWO reasonable costs, expenses, and attorney fees;

E. Award such other and further relief as this Court shall deem just and reasonable.

Respectfully submitted,

| | |
|---|---|
| Carrie Y. Flaxman | /s/Alphonse A. Gerhardstein |
| Jennifer Keighley | Alphonse A. Gerhardstein  # 0032053 |
| Planned Parenthood Federation of America | *Trial Attorney for Plaintiff* |
| 1110 Vermont Avenue, NW, Suite 300 | Jennifer L. Branch # 0038893 |
| Washington, D.C. 20005 | GERHARDSTEIN & BRANCH CO. LPA |
| (202) 973-4800 | Attorneys for Plaintiff |
| (202) 296-3480 (fax) | 432 Walnut Street, Suite 400 |
| carrie.flaxman@ppfa.org | Cincinnati, Ohio 45202 |
| jennifer.keighley@ppfa.org | (513) 621-9100 |

*Co-counsel for Plaintiff*  (513) 345-5543 fax
*Applications for admission pro hac vice*  agerhardstein@gbfirm.com
*forthcoming*  jbranch@gbfirm.com